CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
DEC 07 2015
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

CHASE A. TUCKER
And
JENNIFER M. TUCKER,

    Plaintiffs,

v.              Civil Action No. 6:15CV00047

PINKERTON CHEVROLET - LYNCHBURG, INC.,

SERVE: Compton M. Biddle - Registered Agent
    Osterhoudt Prillman Natt Et. Al.
    3140 Chaparral Dr., Suite 200-C
    Roanoke, Virginia 24018

    Defendant.

## COMPLAINT

1. Plaintiffs bring this action for damages to redress the numerous violations of federal and state statutes governing consumer transactions, as well as the deceit and fraud committed by the defendant in selling the vehicle. This Complaint is filed and these proceedings are instituted under the Truth in Lending Act, 15 U.S.C. §1601 for both statutory and actual damages, reasonable attorney's fees, and costs because of the defendant car dealer's violations of this federal consumer protection statute, because of its violations of the Virginia Consumer Protection Act, and because of defendant's actual or constructive fraud.

## PARTIES

2. The plaintiffs, CHASE A. TUCKER and JENNIFER M. TUCKER, are natural persons residing in Forest, Virginia.

3. Defendant, PINKERTON CHEVROLET - LYNCHBURG, INC. ("PINKERTON"), is a Virginia Corporation engaged, inter alia, in the business of selling new and used vehicles to the

public on a retail basis and has its principle place of business at 801 Graves Mill Road Lynchburg, Virginia, 24502.

4. At all times relevant hereto in the ordinary course of its business, Pinkerton regularly extended or offered to extend, consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, and is the person to whom the transaction which is the subject of this action is initially payable, making Pinkerton a creditor within the meaning of the Truth in Lending Act, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a) (17).

## JURISDICTION

5. This Court has jurisdiction over this action pursuant to 15 U.S.C. § 1640(e) and 28 U.S.C. § 1331, and supplemental jurisdiction of the state law claims regarding the same transactions and events under 28 U.S.C § 1367(a).

## FACTS
*The Vehicle Is Wrecked While Owned By the Defendant and While in Its Possession*

6. On or about March 9, 2012, a 2011 Chevrolet Tahoe 4x4 LT, VIN: 1GNSKBE05BR321576 ("the vehicle"), was sold at auction and purchased by the defendant and was maintained as inventory at defendant's Salem, Virginia location.

7. After purchase, on or about June 8, 2014, while in the possession and ownership of the defendant, it was being driven by one of defendant's managers during a golf outing, and was in a collision with another vehicle which caused significant damage to, *inter alia*, the vehicle's driver side, front bumper, and fender.

2

8.  Repairs were made to the vehicle to some of the areas that were damaged in this collision by defendant's repair shop. The cost of the repairs made by defendant's repair shop was $2,056.42. See Pinkerton Repair Order. **Exhibit A.**

9.  Being the owner of the vehicle and involved in the collision, defendant knew that the vehicle had been damaged on June 8, 2014, knew of the repairs made by its own repair shop, and knew the cost of those repairs was $2,056.42.

10. With knowledge that the vehicle had been damaged and repaired the defendant marketed it online and put it on its sales lot for retail sale.

*Defendant Sells the Vehicle to the Plaintiffs and Misrepresents and Deliberately Conceals the Vehicle's Repair History*

11. The plaintiffs were referred by a friend to defendant and were interested in a Lincoln Navigator they saw online on defendant's website. On or about January 21, 2015, plaintiffs arrived at defendant's Lynchburg location to test drive the Lincoln. The Lincoln Navigator was out of plaintiffs' budget, so defendant's saleswoman, Caryn Watson ("Ms. Watson"), informed plaintiffs that there was a Tahoe out front whose only use was from being test driven. Ms. Watson assured plaintiffs that the vehicle had not been in an accident. Plaintiffs test drove the vehicle, and since it was closing time, Ms. Watson told plaintiffs to take the vehicle home to see if they liked it.

12. The following day, on or about January 22, 2015 the plaintiffs, over the phone, negotiated with Ms. Watson and defendant's Used Car Sales Manager, Tracy Cooper ("Mr. Cooper"), for the purchase of the vehicle.

3

13. During the negotiations over the phone for the vehicle, the plaintiffs explained to Ms. Watson and Mr. Cooper their need for reliable and safe transportation for their family. Plaintiffs wanted the vehicle because of its promised reliability, towing capacity and that it seated eight passengers which suited the plaintiffs and their four children since they would need that size of vehicle for family trips. After negotiating over the phone, that evening plaintiffs went back to defendant's lot to purchase the vehicle. At the lot, plaintiffs asked Ms. Watson if the vehicle had ever been in an accident and Ms. Watson replied absolutely not. Ms. Watson assured them that the vehicle was a "clean car", with no problems, still under factory warranty. In addition, despite its knowledge that the vehicle had been significantly damaged in an accident, the defendant, through Ms. Watson, used the Auto Check as evidence that the vehicle had not been in an accident when Ms. Watson advised the plaintiffs that the vehicle had an Auto Check vehicle history report that showed the vehicle had not been in any accidents or had problems.

14. At the lot, Mr. Cooper and Pinkerton's financing manager had left for the day but had all of the proper paperwork and financing drawn up. The signing of the documents was being handled by another sales manager, Ben Abraham ("Mr. Abraham"). At this time plaintiffs asked again, this time to Mr. Abraham, if the vehicle had ever been in an accident or damaged. Mr. Abraham said no, and despite the defendant's knowledge of the prior accident damage, he advised that the Auto Check report they do on all their cars shows it has not been in an accident, and added that if the vehicle had been in an accident the defendant would have to disclose that to plaintiffs.

15. In reliance on the above statements of Ms. Watson, Mr. Cooper and Mr. Abraham about the vehicle and the belief that there was nothing wrong with the vehicle and that it had never been

4

Case 6:15-cv-00047-NKM-RSB Document 1 Filed 12/07/15 Page 4 of 18 Pageid#: 4

in an accident, the plaintiffs agreed to purchase the vehicle for over $36,000.00. See Buyers Order attached as **Exhibit B**.

*Defendant promises to find the best interest rate available for the plaintiffs' vehicle loan, and after inflating the interest rate plaintiffs were approved at, it misrepresents the interest rate of 4.99% as the best rate available, which was only obtainable if they purchase GAP insurance, it conceals the lowest interest rate the plaintiffs were approved for, and is paid a kickback from the assignee of the Retail Installment Sales Contract based on the inflated rate.*

16. During the negotiations over the phone, when defendant learned that the plaintiffs would need to finance the purchase of the vehicle, Ms. Watson and Mr. Cooper encouraged plaintiffs to finance the vehicle through the defendant and told them that the defendant would find them the lowest rate available because they deal with so many banks. This promise was made even though the defendant did not have the present intent to provide them with the best interest rate if it could convince them into paying more than the lowest interest rate offered.

17. Based on numerous cases in which counsel for the plaintiffs has been involved in where car dealers concealed the lowest rate the buyer was approved at, it is believed that at the time it made the promise to the plaintiffs to provide the best or lowest interest rate available, the defendant did not have the present intent to do so since it knew it would inflate the interest rate offered by the potential assignee of the Retail Installment Sales Contract (RISC), in order to receive an undisclosed kickback based on the amount it inflated the interest rate.

18. During these negotiations for the financing the plaintiffs were told by Mr. Abraham that their loan application had been approved by three lenders and First National Bank offered the lowest financing rate possible at 5.99%. Furthermore, Mr. Abraham said that if they agreed to

5

purchase GAP insurance (GAP), their loan's interest rate could be lowered to 4.99%.[1] These products or "Add Ons" are sometimes called "back end" products, since they are not added until the back end of the deal once the vehicle price has already been agreed to.

19. The scheme of adding these back end products into the deal, without the plaintiffs knowing that they were not required to obtain this purchase money loan, and that they were causing their loan payment to be higher than was necessary to finance the vehicle, is a sharp sales tactic known in the car sales industry as "loan packing".

20. Since Mr. Abraham was a manager and appeared to have the knowledge and authority to make his offer regarding the 4.99% interest rate, the plaintiffs reasonably relied on his fraudulent statements regarding the GAP coverage which induced them to agree to purchase the GAP coverage prior to the signing of any contracts.

21. Trusting that Mr. Cooper to be telling the truth when he said that the interest rate of 5.99% offered, or 4.99% if GAP was purchased, the plaintiffs reasonably relied on these statements in agreeing to the final purchase price of the car and the financing.

22. Had the cost of GAP not been required to get the financing at 4.99%, the plaintiffs' monthly loan payments, the Finance Charge, the Amount Financed and the Total Sale Price would have been less than what the RISC required.

---

[1] *Gap insurance is insurance coverage for vehicles. It may pay the difference between the balance of a lease or loan due on a vehicle and what your insurance company pays if the vehicle is considered a covered total loss. Thus, if a vehicle car is totaled, and the amount insurance company pays is less than the amount still owed on the loan for the vehicle, there is a "gap" between the payoff and what the insurance co. pays for the value of the totaled vehicle. GAP insurance pays to cover this "gap".*

23. The purchase of GAP was not a requirement of First National Bank in order for it to approve the plaintiffs' loan application at 4.99%.

24. Had the plaintiffs not been told by defendant's manager that purchase of GAP was required to get the 4.99% purchase money loan, they would not have purchased it.

25. After some time, Mr. Abraham returned with the contracts to sign, and advised the plaintiffs that the annual percentage rate and monthly payment, 4.99% and $617.35 respectively, was the best rate and monthly payment he could find.

26. In consideration of the promises and agreement by Defendant to sell the plaintiffs the "bundle" of goods and services they agreed to purchase the vehicle in the amount and on the terms in the Retail Installment Sales Contract. Thus, among many other documents, they signed the RISC and the GAP Debt Waiver contract, attached as **Exhibits C and D**.

27. The representation by Mr. Abraham that the purchase of GAP Insurance was required for the plaintiffs to get the 4.99% interest rate is not contradicted by the GAP Insurance contract's clause which states that GAP insurance it is not required to get credit since, since, based on what plaintiffs were told, they would have received an extension of credit at 5.99% without the purchase of GAP. Therefore the GAP contract's statement that the GAP insurance purchase is purely voluntary and not required to obtain an extension of credit gave plaintiffs no reason to doubt the oral statement by Mr. Abraham that to get the reduced interest rate of 4.99%, GAP Insurance was required to be purchased.

28. The goods which were the subject of the "bundled" agreement included the vehicle, while the "services" portion of the "bundled" agreement included, among other things, the assistance

7

and advice Defendant gave to plaintiffs concerning obtaining an extension of credit in order to finance the entire transaction.

29. Plaintiffs entered into the foregoing consumer credit transaction by executing the RISC, on which the defendant is listed as the seller/creditor, a credit contract which included a finance charge, and which was subsequently assigned by Defendant to First National Bank.

30. As part of the consumer credit transaction, Defendant retained a security interest in the subject vehicle.

31. During the relevant period of time, First National Bank (FNB) had a lender/dealer agreement with the defendant by which it accepted assignment of consumer sales contracts arising out of defendant's sales of vehicles or made consumer loans in connection with sales transactions by defendant for the purpose of enabling consumers to purchase vehicles from defendant.

32. Upon information and belief this lender/dealer agreement authorized defendant to mark up or inflate the rate of interest above the "approved" rate or lowest rate at which FNB would be willing to lend money to customers like the plaintiffs. The interest rate at which FNB would be willing to lend money to approved customers like the plaintiffs is called the "Discount Rate" or the "Buy Rate."

33. Upon information and belief the lender/dealer agreement provided that FNB would pay into the defendant's reserve account all or part of any additional interest that was charged as a result of the dealer marking up the interest rates. The difference between the interest rate at which FNB approves the loan ("bank retention rate" or Buy Rate) and the rate at which customers are contracted is called the "Customer Rate" or "Contract Rate" or "Sell Rate". The difference between the Buy Rate and Sell Rate is called the "yield spread premium".

8

Case 6:15-cv-00047-NKM-RSB   Document 1   Filed 12/07/15   Page 8 of 18   Pageid#: 8

34. Defendant deliberately concealed and did not disclose to plaintiffs the fact that it would receive a kickback or be paid all or part of the "yield spread premium," or that additional interest was charged on top of the lowest rate they had been approved at, or that the rate it told the plaintiffs about was not the best rate it could find.

35. Upon information and belief, Defendant inflated the interest rate pursuant to the lender agreement and FNB paid the defendant, in its reserve account, all or part of the additional interest that was added to the Buy Rate.

36. Defendant was able to talk the plaintiffs into an interest rate which it is believed was higher than the lowest rate their loan had been approved at by FNB by misrepresenting that the Contract Rate of 5.99% if no GAP was purchase, and 4.99% if GAP was purchased, was the lowest that could be found.

37. Based on plaintiffs' counsel's experience with other car dealers, it is believed it is a common business practice for dealers like the defendant, when it obtains financing for its customers, to in many cases inflate the interest rate at which the customer was approved by the lender to whom defendant intends to assign the loan, and to conceal the interest rate the customer was approved at (the "Buy Rate") when discussing the loan with the customer, and to conceal that defendant had inflated the buy rate. Furthermore, upon this same information it is believed that it is an established business practice of defendant to often give customers the impression that the interest rate the dealer will find for the customer is the lowest rate it could obtain from third party lenders, to falsely promise that it will find them the best rate, even though it has no intention of providing its customers with the Buy Rate, and to misrepresent that the rate offered on the retail installment sales contract as the best rate available, unless defendant would lose the sale otherwise.

9

Case 6:15-cv-00047-NKM-RSB   Document 1   Filed 12/07/15   Page 9 of 18   Pageid#: 9

*Plaintiffs Discovers the Vehicle Had Been Previously Wrecked*

38. After purchase and driving the vehicle for a couple of months and not being satisfied with its drivability and the fact that plaintiffs had now become a one car family, the plaintiffs decided it would be more practical to trade the vehicle in for two cars equaling the same payment. Thus, plaintiffs attempted to trade it in at Shelor Motor Mile in Christiansburg, Virginia. On August 11, 2015 Shelor Motor Mile showed plaintiffs a Carfax Vehicle History Report it obtained and advised them that the vehicle had been previously wrecked. The Carfax listed the vehicle as having an accident reported on June 8, 2014.

39. The accident described in the above paragraph occurred while in defendant's possession and while it owned the vehicle. See Carfax report. **Exhibit E.**

40. On or about August 17, 2015 plaintiffs confronted defendant with the evidence of the vehicle's prior wreck damage. Ms. Watson told plaintiffs that she would look into the matter, and assured plaintiffs that her manager would make it right.

41. After the meeting on August 17, 2015 Ms. Watson called plaintiffs and informed them that the vehicle came with an Auto Check report which did not show any prior accident history and asked if plaintiffs were certain about this prior damage. Plaintiffs sent Ms. Watson a copy of the Carfax report who in turn asked if plaintiffs could come down to the car lot to discuss.

42. Once they returned, while at the car lot, Ms. Watson told plaintiffs that the reason why this accident might not have been showing up on their Auto Check report was because some people do not report accidents to insurance companies, that the defendant only has Auto Check reports to rely on, and that they would never intentionally sell plaintiffs a damaged car without disclosing it.

10

Case 6:15-cv-00047-NKM-RSB   Document 1   Filed 12/07/15   Page 10 of 18   Pageid#: 10

43. Ms. Watson offered to buy back the vehicle at a depreciated price much lower than the price plaintiffs paid for it, or trade it in on another vehicle. Plaintiffs rejected this offer and requested a full refund. When Ms. Watson turned their demand down plaintiffs requested to speak with the manager.

44. Plaintiffs informed Mr. Cooper that the wreck damage history on the vehicle has diminished its value and if the dealer was going to sell a wrecked car it should sell it at the wrecked car's actual value. The sales manager, Mr. Cooper, told them that he gets over a hundred cars on his lot every day and he can only rely on the Auto Check report. Plaintiffs replied by informing him that the wreck had occurred while owned by the defendant and while it was in the defendant's possession. Mr. Cooper then told plaintiffs he will have to do some research and get back to them.

45. A day later, on or about August 18, 2015, Ms. Watson advised the plaintiffs that the vehicle had been in an accident while at defendant's Salem location, that the vehicle had been bumped, the damage was cosmetic, and asked plaintiffs to come back to the office to discuss. At this meeting Mr. Cooper informed plaintiffs that the vehicle had been in an accident with one of defendant's managers in South Carolina who was there playing golf. Supposedly, the manager was filling up gas when another car "T-boned" into the side of the vehicle. The repairs had been done by defendant's own body shop (Pinkerton Body Shop) in Lynchburg, Va. Both Mr. Cooper and Ms. Watson repeated to plaintiffs that a wrecked vehicle does not depreciate in value unless the airbags were deployed. A copy of the repair order was given to plaintiffs that listed the accident as a "T-bone" style hit. The repair order by defendant lists the repair cost of $2,056.42. See Pinkerton Repair Order (Exhibit A).

46. Plaintiffs asked defendant what it was willing to offer to make things right. Mr. Cooper replied with an offer of $26,000 for a vehicle they had paid over $36,000 for earlier in the year. Plaintiffs told Mr. Cooper and Ms. Watson that the vehicle had a 3rd row, leather interior, and 20" rims. Mr. Cooper then offered $28,000. Plaintiffs rejected this offer.

47. The fraudulent acts of the defendant have caused damage to the plaintiffs in that they were induced to purchase the vehicle at a price in excess of its fair market value, they financed the purchase at higher interest rate that the best rate offered by the lenders to which the defendant attempted to assign this loan, and they paid for GAP insurance that they would not have bought if they had known it was not required to get the 4.99% interest rate. Also, the vehicle is not and cannot be that which it was represented to be, namely a motor vehicle undamaged and with no problems, and they have suffered incidental and consequential damages.

48. The defendant's misrepresentations, silence, and concealment of the damage and repairs, its deceptive use of the "clean" Auto Check report, when it knew that report was incorrect regarding prior damage, as well as the misrepresentations about the interest rates, and the requirement to purchase the GAP insurance to get the 4.99% loan rate, were intentional and material, were intended to mislead, were deceptive, and were intended to induce the plaintiffs to purchase and finance the vehicle on the terms offered by the defendant. As such these actions were unconscionable, constituted actual malice or a reckless and conscious disregard of plaintiffs' rights, and therefore constitute actual fraud, or were done negligently and therefore constitute constructive fraud.

49. The actions and statements of Ms. Watson, Mr. Cooper, and Mr. Abraham were within the scope of their actual or apparent authority as an agent, officer, and employee of the defendant.

12

Case 6:15-cv-00047-NKM-RSB Document 1 Filed 12/07/15 Page 12 of 18 Pageid#: 12

50. The fraudulent actions of the defendant's employees, as described above, were ratified by the defendant when it learned of the sale of the vehicle with no disclosure of the damage as well as when it attempted the repairs, learned of the accident damage, failed to disclose its discovery to the plaintiffs, and deceitfully misled then by advising them that the vehicle's Auto Check Report was clean when it knew the vehicle had been in an accident and the Auto Check report was not accurate about the vehicle's accident history.

51. Defendant benefitted from plaintiffs' reliance on its misrepresentations by causing the plaintiffs to enter into the transaction and by gaining the additional profits resulting from plaintiffs' reliance on defendant's acts, misrepresentations, and omissions.

52. As a direct and proximate result of defendant's acts and omissions, the plaintiffs have suffered damages, past, present, and future, including but not limited to, the loss of the benefit of the bargain, paying an excessive price for the vehicle, excessive finance charges, loss of use, inconvenience, embarrassment, and aggravation, together with costs and attorney fees incurred in obtaining relief from defendant's wrongful acts and omissions.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violations of the Truth in Lending Act ("TILA), 15 U.S.C. §1601 et al

53. Plaintiffs reiterate and incorporate the previous paragraphs 1 through 52 above as if fully set out herein.

54. The only TILA disclosures made to plaintiffs by defendant pursuant to 15 U.S.C. §1638, and Regulation Z, were those made on January 22, 2015 and contained within the RISC.

55. Defendant violated the TILA in one or more of the following ways, by example only, and without limitation:

   a. By failing to include in the finance charge certain charges imposed by the defendant payable by the plaintiffs incident to the extension of credit as required by 15 U.S.C. §1605 and Regulation Z §1026.4 (formerly §226.4), thus improperly disclosing the finance charge in violation of 15 U.S.C. §1638(a)(3) and Regulation Z §1026.18(d) [formerly §226.18(d)]. Such amounts include the $800 extra that the defendant said the plaintiffs had to pay in order finance the vehicle at the 4.99% interest rate. This $800 was not included in the finance charge in the RISC and thus the disclosures for the finance charge and annual percentage rate are incorrect.

   b. By reason of the aforesaid violations of the TILA and Regulations Z, defendant is liable to plaintiffs in the amount of twice the finance charge or $2000, whichever is less, actual damages, legal fees and costs in accordance with 15 U.S.C. §1640(a)(3).

56. As a result of the above alleged violations of the TILA plaintiffs are entitled to actual damages pursuant to 15 U.S.C. §1640(a) (1) statutory damages pursuant to 15 U.S.C. §1640(a)(2), and costs and attorney's fees pursuant to 15 U.S.C. §1640(a)(3).

## SECOND CAUSE OF ACTION
## Violations of the Virginia Consumer Protection Act (VCPA)

57. Plaintiffs incorporate the allegations of paragraphs 1 through 56 as if alleged herein.

58. The sale of the vehicle to the plaintiffs was a "consumer transaction", the vehicle constitutes "goods", the defendant is a "supplier", and the plaintiffs is a "person" as defined in §59.1-198 of the Code of Virginia.

59. The defendant misrepresented and deliberately failed to disclose to the plaintiffs the material fact that the vehicle had been in a prior wreck, damaged and repaired, and deceptively

14

used the Auto Check report as evidence that the vehicle had never been in an accident when it knew it had, during negotiations with them for the purchase of the vehicle, in violation of Sections 59.1-200 A(6), (7) and (14).

59. The defendant's misrepresentations about the financing and interest rates and its tactic of "loan packing" and advising that the GAP insurance was required to get the 4.99% interest rate (as described above) were deceitful and fraudulent. These actions violate §§59.1-200 A (6), (7) and (14).

60. The defendant's promise to find the plaintiffs the best interest rate available was intentionally false, in violation of §§59.1-200 A (14).

61. The defendant intended that the plaintiffs rely upon the above-described misrepresentations and omissions, which they did.

62. The above-described actions were committed by the defendant willfully, wantonly and with reckless disregard of the rights of the plaintiffs and entitle the plaintiffs to seek recovery of three times the actual damages, plus attorney fees and court costs, pursuant to Va. Code §59.1-204 of the Code of Virginia, or if found that these actions were unintentional are a violation of Va. Code §59.1-207.

### THIRD CAUSE OF ACTION
### Fraud/Constructive Fraud

63. Plaintiffs incorporate the allegations of paragraphs 1 through 62 as if alleged herein.

64. The actions of the defendant in the misrepresentations and concealment about the ownership and accident history, as well as its deceit, misrepresentations and concealment about

15

the financing, the interest rate, the requirement that the back end products be purchased to get financing, engaging in "loan packing", its false promise to find them the lowest interest rate for the purchase money loan made without the present intent to provide them the lowest interest rate, and the other misrepresentations described above, were intentional and constitute actual fraud.

65. Defendant made these misrepresentations, false promises, and concealed this information so that plaintiffs would agree to purchase and finance the car on the terms and for the price it demanded and so they would not discover the vehicle's wreck history.

66. Plaintiffs reasonably relied on these representations by agreeing to purchase and finance the vehicle and suffered damages as a result of that reliance.

67. Defendant authorized, approved, or ratified the misrepresentations made by the employees that dealt with the Plaintiffs.

68. In the alternative of actual fraud, these misrepresentations were made innocently or negligently sufficient to support a claim for constructive fraud.

### Request for Punitive Damages for Fraud

69. The actions by defendant were done intentionally and indicate willful and malicious conduct in conscious disregard of plaintiffs' rights sufficient to justify an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully pray that this Court:

1. Assume jurisdiction of this case;

16

2. Award actual damages pursuant to the Truth in Lending Act, 15 U.S.C. §1640(a)(1), statutory damages pursuant to 15 U.S.C. §1640(a)(2), and costs and attorney's fees pursuant to 15 U.S.C. §1640(a)(3).

3. Award actual damages and any available statutory damages under the Virginia Consumer Protection Act and actual damages for the fraud claims against the defendant;

4. Award three times the actual damages or $1,000.00, whichever is greater, for each willful violation of the Virginia Consumer Protection Act pursuant to Va. Code § 59.1-204;

5. Award plaintiffs' punitive damages against the defendant in the amount of THREE HUNDRED THOUSAND FIFTY DOLLARS and ZERO cents ($350,000.00).

6. Award plaintiffs' costs, pre-judgment interest, and reasonable attorney's fees in accordance with the Virginia Consumer Protection Act and fraud counts; and

7. Award such other relief as the Court deems appropriate against defendant.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,

CHASE A. TUCKER
And
JENNIFER M. TUCKER,

By _____
       Counsel

17

John Cole Gayle, Jr.
VSB No. 18833
The Consumer Law Group, P.C.
5905 West Broad Street, Suite 303
Richmond, Virginia 23230
(804) 282-7900
(804) 673-0316 (Fax)
jgayle@theconsumerlawgroup.com

Ian Edward Vance
VSB No. 88062
The Consumer Law Group, P.C.
5905 West Broad Street, Suite 303
Richmond, Virginia 23230
(804) 282-7900
(804) 673-0316 (Fax)
ivance@theconsumerlawgroup.com

       Counsel for Plaintiffs